UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
Southern Division

| | |
|---|---|
| **ARISTOTLE RUSH** ) <br> ) <br> **Plaintiff** ) <br> **v.** ) <br> ) <br> **HUNTINGTON INGALLS** <br> **INCORPORATED** ) <br> ) <br> **Defendant.** ) | **Case No.** 1:24cv159HSO-BWR |

## AMENDED COMPLAINT

COMES NOW Plaintiff, Aristotle Rush, by and through undersigned counsel and hereby brings this civil action pursuant to Title VII of the Civil Rights Acts of 1964 ("Title VII") as amended, 42 U.S.C. §2000 et seq and 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991 ("Section 1981") et seq against Huntington Ingalls Incorporated for race discrimination and retaliation.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331 (federal question), to hear federal claims pursuant to Title VII, and Section 1981.

2. Venue is proper in this judicial district under 42 U.S.C. 2000e-5(f)(3) as Plaintiff was employed by Defendant, through its Ingalls Shipbuilding division, at its facilities in Pascagoula, Mississippi at the time of the discrimination complained of, and the incidents and decisions adverse to Plaintiff's employment that are the subject of this civil action were made in this judicial district.

## PARTIES

3. Aristotle Rush ("Mr. Rush" or "Plaintiff") is an African American male, a citizen of the United States, and a resident of the state of Mississippi. At all times relevant to this suit, he was employed with Huntington Ingalls Incorporated at its facilities in Pascagoula, Mississippi.

4. Huntington Ingalls Incorporated ("Huntington," or "Defendant") is a Virginia Corporation licensed to do business in the state of Mississippi. Defendant can be served with process by and through its registered agent, CT Corporation System, at 645 Lakeland East Drive, Suite 101, Flowood Mississippi 39232.

## FACTS COMMON TO ALL COUNTS

5. Aristotle Rush began his career with Defendant in November 2022 as an Electrician Regular Apprentice.

6. As an apprentice, Mr. Rush was required to attend classes and to work with a first classmen to learn his craft. His duties included pulling cables and installing and mounting electrical equipment.

7. The Electrical Apprentice Program is supervised by a Joint Apprentice Training Committee ("JATC") The JATC members include Kelley Buley (White female), Albert Williams (Black male) and union members, Barry Clark (White male), and Chris Wierson (White male). Ms. Buley assigns apprentices to foremen. Mr. Rush was initially placed with Ryan Bickel (Black male); however, Mr. Bickle was retiring, and Mr. Rush was assigned to Ben Pierce, a white male.

8. At some point while working under Mr. Pierce, Mr. Rush and another Black male apprentice, Quan Dunning, were assigned to work in a small room together. They noticed that the room was filthy. However, they completed the work they were assigned to do and cleaned the area of the room where they had worked. The next day, the two were written up for a violation for failure to clean the work area.

9. Upon information and belief, the same day, a white male employee, Hunter, turned in his welding tool improperly. Pierce advocated on behalf of this employee to get the write- up removed but did not do the same for Mr. Rush or Mr. Dunning.

10. Around March 2023, Mr. Rush inquired about receiving tutoring from Mr. Keith Schwartz (white male). Schwartz agreed to provide tutoring to the Plaintiff. Plaintiff's tutoring was supposed to take place on about March 28, 2023. On the day the tutoring was supposed to take place, Schwartz told Rush that he was on vacation. Mr. Rush contacted Schwartz to follow up, but Schwartz did not answer. Instead, Kelley Buley contacted Mr. Rush to ask why he had contacted Schwartz knowing he was on vacation. Rush also received a text message from Kelley Buley which stated, "I had already told him that. I want to (gun emoji) him!!!!!!" Rush was shocked and responded approximately fifteen minutes later. Ms. Buley downplayed the text saying, "That wasn't for you. Sorry wrong recipient." This message deeply disturbed Mr. Rush and left him fearful for his job.

11. Mr. Rush showed the message from Ms. Buley to Mr. Tyson, a white male, who worked with the maritime training academy and requested his advice on how to handle Ms. Buley's message. Tyson advised Mr. Rush that the message might get Ms. Buley fired. Rush was very upset about the message and asked Tyson for information about company programs that could help him deal with the stress Ms. Buley's message was causing him.

12. Rush did eventually make an appointment through the company's mental health program. He was hesitant to attend as he had been told that it may not be confidential.

13. Around the same time as he received the messages, Mr. Rush was notified that he and

Mr. Dunning was to meet with Ms. Buley, Mr. Pierce and union representative, Mr. Adam Dole (white male). Mr. Rush and Mr. Dunning were both removed from their current assignments and placed with Mr. Omar Mestre (Hispanic male) on another boat.

14. Mr. Rush's working environment only deteriorated under Mr. Mestre. Mr. Mestre often treated Rush and Dunning differently from their Hispanic colleagues. Mr. Rush requested a meeting with Mestre to discuss unequal treatment.

15. After the meeting Mestre stated that Rush and Dunning "were a problem" on their previous crew. Mestre would repeat this on several occasions.

16. Mestre would also call Mr. Rush over the intercom at times when Rush would be on a brief bathroom break which caused Rush to be embarrassed. Mestre did not use this same practice with Hispanic colleagues when they took brief or even extended breaks. Mestre would also come to Rush's work area multiple times a day though he did not appear to do this to Rush's Hispanic colleagues.

17. On occasion, Mr. Rush asked Mestre to be placed with experienced crew members like "Riley" or "Chris" so that he could enhance his skills. Mestre refused, saying that these crew members worked "hot jobs" and could not be placed with him daily. However, Mestre later allowed Jaycee Schummerman to work with these individuals daily. When questioned about it, Mestre told Mr. Rush that this "did not apply" to Ms. Schummerman.

18. On or about June 12, 2023, Mestre gave Mr. Rush a poor performance evaluation. Mr. Rush noted that the evaluation was inaccurate and did not sign it. Upon information and belief, Mr. Dunning was also given a poor evaluation. Ms. Schummerman was given a good evaluation.

19. Approximately two weeks after receiving the poor evaluation, while at work, Rush

found out that his father was near death. Rush left work that day to be with his father but returned the next day or so. Unfortunately, Rush's father soon passed away. Rush reported this to Barry Clark. Clark advised Rush that if he got a doctor's excuse for two weeks, his absence from work during that time would be excused.

20.  Rush took time off from work. He attended his father's funeral on or about July 8, 2023. He returned to work on about July10, 2023. On July 11, 2023, Rush was given another bad evaluation.

21.  Rush was sent to "kangaroo court" where he met with Ms. Buley, Mr. Clark, Mr. Williams, and a second union representative. The team referenced Rush's absence from work and informed him that he would be on probation for 180 days. Rush was also informed that he would receive a five hundred hour pay freeze. Mr. Rush felt this was unjust and did not want to sign the documentation he was given at that time. Rush was told that if he did not sign the documentation that it would be considered insubordination.

22. About one month later, Mr. Rush and Mr. Dunning were moved again. Mestre told the men that the move was temporary and did not give them transfer documents.

23. Rush and Dunning were now being supervised by Shane Massengill, a white male, and a friend of Ms. Buley.

24. Mr. Rush reported to Mr. Massengill that he wanted a clean slate and new opportunity. Rush hoped his working environment would improve, but it became worse almost immediately.

25.  Mr. Massengill would scream and curse at Rush in front of others. He also referred to Rush as a 'crybaby" for going to a doctor.

26. Rush reported Massengill's behavior via Ingall's hotline. Massengill escalated his

behavior when he found out that Rush had reported him. This led to Rush reporting Massengill a second time.

27. At some point, Rush met with a white female investigator. She discussed issues of discrimination that Rush reported about Ben Pierce, Omar Mestre, and Shane Massengill, but appeared to minimize those issues. She even suggested to Rush that the message he had received from Ms. Buley was not related to him. No further action was taken by Defendant regarding Rush's complaints.

28. In the meantime, Rush had been taking advantage of the company's mental health program and having meetings with April Krieger. Before his last session with Ms. Krieger, she requested that Rush send her a timeline of what he had been experiencing at the company. Rush was then referred to offsite resources.

29. Sometime in September or October 2023, Rush was given another bad evaluation. Massengill stated to Rush, "What did you think was going to happen? You tried to get your boss in trouble!"

30. Shortly after this, on or about October 26, 2023, Rush was searched twice in front of his colleagues due to an alleged report that he was carrying a knife and 'talking to himself." He was escorted off the shipyard and placed on an unpaid suspension.

31. Plaintiff filed a charge of discrimination against Huntington for race discrimination and retaliation on November 8, 2023. *See* Exhibit A.

32. Jason Vito, a union representative, initially told Rush to find another job. However, after Mr. Rush filed his charge of discrimination, Vito and Mark Frederick contacted Mr. Rush. The two men appeared to be offering Rush an opportunity to get his job back. However, the

conditions they discussed failed to address Rush's concerns about discrimination and intimidation he had experienced and his concern about his safety while at work.

33. Plaintiff exhausted all administrative remedies and at all times has fully cooperated with the EEOC investigation. Plaintiff received a right to sue letter from the EEOC dated March 1, 2024, and timely files this lawsuit.

## COUNT I

## VIOLATION OF TITLE VII

## DISCRIMINATION BASED ON RACE

34. Plaintiff adopts and incorporates by reference each and every allegation as set forth above.

35. Title VII of the Civil Rights Act makes it an unlawful practice to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

36. Defendant discriminated against Plaintiff by disciplining him and treating him differently than similarly situated non-African American/Black colleagues. The Defendant also labeled Plaintiff and another Black colleague as "a problem" and transferred them to various on-site facilities and supervisors.

37. The Defendant perpetuated the discrimination by allowing supervisors to harass Plaintiff and ignoring Plaintiff's reports and complaints about his mistreatment.

38. Defendant failed to discipline anyone based on Plaintiff's complaints of discrimination and intimidation, but instead placed Plaintiff on probation with a pay freeze, and ultimately terminated him.

39. Defendant thus engaged in intentional and unlawful bias against Plaintiff because of his race.

40. As a direct, legal, and proximate result of Defendant's unlawful discrimination, Mr. Rush has suffered severe humiliation, emotional distress, lost wages, and other economic damages.

## COUNT II

## VIOLATION OF TITLE VII- RETALIATION

41. Plaintiff adopts and incorporates by reference each and every allegation as set forth above.

42. Title VII of the Civil Rights Act of 1964 ("Title VII") protects individuals against retaliation for filing charges of discrimination, participating in an investigation, or reporting and opposing discriminatory practices.

43. Plaintiff made several complaints to Defendant about intimidation and discrimination, he was experiencing from his supervisors. Plaintiff reported receiving a text message including a gun emoji from a white supervisor. Plaintiff also made reports of discriminatory conduct. Plaintiff even reported ill treatment that included a white supervisor cursing and yelling at him. Plaintiff made reports to Defendant's hotline on more than one occasion.

44. These events triggered Defendant's retaliation against Plaintiff. Rather than working with Plaintiff to achieve a resolution, Defendant intensified its conduct. Instead of addressing the Plaintiff's complaints, Defendant rewarded plaintiff with poor evaluations, probation, and a pay freeze, embarrassment front of colleagues, unpaid suspension, and termination.

45. As a direct, legal, and proximate result of Defendant's unlawful discrimination and retaliation, Mr. Rush has suffered severe humiliation, emotional distress, lost wages, and other

economic damages.

## COUNT III
## VIOLATION OF 42 U.S.C. §1981- RACIAL DISCRIMINATION

46. The Plaintiff adopts and incorporates by reference each and every allegation as set forth above.

47. As stated herein, the Defendants engaged in their discriminatory practices in the form of unfairly disciplining and mistreating the Plaintiff, an African American apprentice, in addition to evaluating Plaintiff in a manner that was arbitrary and discriminatory.

48. Defendant's actions were intentional, willful, and taken with wanton disregard of Mr. Rush's right to be free from discrimination under Section 1981.

49. As a direct, legal, and proximate result of Defendant's unlawful discrimination, Mr. Rush has suffered severe humiliation, emotional distress, lost wages, and other economic damages.

## COUNT VI
## VIOLATION OF 42 U.S.C. §1981- RETALIATION

50. Plaintiff adopts and incorporates by reference each and every allegation as stated above.

51. Defendant retaliated against Mr. Rush in violation of Section 1981, and this includes but is not limited to, poorly evaluating Rush, placing him on probation with a pay freeze, suspending him without pay, and terminating him for her reporting racial discrimination and intimidation he received at the hands of his managers.

52. Defendant's actions were intentional, willful, and taken with wanton disregard of

Mr. Rush's right to be free from discrimination and retaliation under Section 1981.

53. As a direct, legal, and proximate result of Defendant's unlawful discrimination and retaliation, Mr. Rush has suffered severe humiliation, emotional distress, lost wages, and other economic damages.

**WHEREFORE,** Plaintiff prays that the Court enter judgment in his favor and against Defendant, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States and the State of Mississippi;

B. An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory harm, including but not limited to, compensation for his mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, emotional distress and physical injuries;

F. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

    G.     An award of punitive damages;

    H.     An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

    I.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury.

                              Respectfully Submitted,

                              ARISTOLE RUSH

                              /s/ *Darrian A. Denman*_____
                               Darrian A. Denman

OF COUNSEL:

DARRIAN A. DENMAN, MSB#105159

THE DENMAN LAW FIRM, PLLC
4780 I-55 N, Suite 100
Jackson, Mississippi 39211
Telephone: (601) 899-0141
Facsimile: (601) 709-4611
dadenman@denman-law.com